UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


| | | |
|---|---|---|
| Jeanne Steigerwald, individually and on behalf of all others similarly situated, | ) ) ) ) | CASE NO. 1:15 CV 741 |
| Plaintiff, | ) ) | JUDGE PATRICIA A. GAUGHAN |
| Vs. | ) ) ) | |
| BHH, LCC, Van Hauser, LLC, and E. Mishan and Sons, Inc. Defendant. | ) ) ) | **Memorandum of Opinion and Order** |

**Introduction**

This matter is before the Court upon defendants' Motion for Summary Judgment (Doc. 33) and defendants' Motion to Exclude the Testimony of Plaintiff's Proffered Expert Witness Richard Kaae (Doc. 34). This case involves consumer sales of electronic pest control devices. For the following reasons, both motions are GRANTED.

**Facts**

Plaintiff Jeanne Steigerwald filed this Class Action Complaint against defendants BHH, LLC; Van Hauser, LLC; and E. Mishan and Sons, Inc dba Emson, Inc.  The Complaint originally asserted five claims. In briefing on a prior motion to dismiss, plaintiff stated that

1

she was not pursuing Counts Three and Five. The Court granted the motion to dismiss as to Count One and denied it as to Counts Two and Four.  Accordingly, those two claims remain: fraud and breach of express warranty.   The Court also granted plaintiff's Motion for Class Certification as requested therein.

The Complaint alleges the following.[1] Defendants manufacture, market, and distribute electronic pest control devices that allegedly repel pests from the user's home.  Despite defendants' advertisements stating that the devices repel mice, ants, spiders, and other pests by electromagnetic/ultrasonic power using wiring within the walls to emit a signal, the devices do not repel pests.

In order to expel pests from her house, plaintiff went to a Wal-Mart in May 2013 and purchased a Bell+Howard-trademarked electronic/ultrasonic pest control device manufactured and marketed by defendant. Defendant BHH licenses the Bell+Howard trademark to defendants Van Hauser and EMSON for the purpose of designing, manufacturing, distributing, marketing, and selling the ultrasonic pest control device purchased by plaintiff. The device's packaging labels it as an "electronic pest repeller" and states that it uses "ultrasonic sound waves [to] help to eliminate mice, rats, roaches, spiders, and ants." Defendants' website also states that the device uses ultrasonic power to emit a signal to drive away insects and rodents.  Plaintiff purchased the device based on defendants' representations.  Although plaintiff used the device as instructed, it did not repel pests in and/or around plaintiff's home.  The scientific literature indicates that these products have no effect on pests. Defendants had reason to know that their claims and representations were

---

[1]  The parties do not offer a statement of facts in support of their motions.

false and contrary to scientific evidence, but they continued to advertise the devices as effectively controlling pests.

This matter is now before the Court upon defendants' Motion for Summary Judgment and defendants' Motion to Exclude the Testimony of Plaintiff's Proffered Expert Witness Richard Kaae.

**Standard of Review**

Summary Judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993). The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)). A fact is "material only if its resolution will affect the outcome of the lawsuit." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir.1993). The nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322). Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citation omitted).

### **Discussion**

In support of its Motion for Summary Judgment, defendants assert that the opinions of plaintiff's expert witness, Richard Kaae, do not meet the standards for the admissibility of expert testimony, and should be excluded. And, even if the expert testimony is admitted, plaintiff still cannot sustain her burden of proof because Kaae's tests were conducted in a manner contrary to the device's intended use. This is the basis of the separate Motion to Exclude, which defendants incorporate into the Motion for Summary Judgment. Therefore, the motions will be addressed in conjunction with one another, and not separately. Finally, assuming the expert testimony is not excluded, defendants argue that plaintiff's breach of warranty claim fails for lack of pre-suit notice.

Defendants argue that the expert testimony is inadmissible and, therefore, plaintiff is

unable to establish that the Bell+Howell Ultrasonic Pest Repellers are incapable of repelling the pests identified on the product's packaging which precludes her from establishing a prima facie case for her claims. Plaintiff has proffered the opinion testimony of Richard Kaae in the form of his expert report wherein he concludes:

> Based on the provided and prevailing scientific literature it is clear that ultrasonic pest repellers are generally unable to repel cockroaches, ants, spiders and small vertebrates such as mice in any manner.  See Sonic Deterrents in Animal Damage Control[2] in the case of mice and other rodents.
>
> Also, my following research through a field test, [sic] it is clear that the Bell+Howell Ultrasonic Pest Repeller is not able to repel ants in any manner and does not:
>
> • Repel ants in field situations. (Dr. Kaae provided field studies).
> • Repel randomly foraging ants seeking a food source.
> • Affect the activity of trail following ants.
> • Affect long-term feeding activity of ants.
> • Because the device does not repel ants and other pests as claimed, it logically follows that these devices would have no value in controlling the indicated pests.

(Doc. 25 at 12-13)**.**

Defendants assert that Kaae does not possess the requisite expertise.  Nor are his opinions based on science because he relied on publications authored by others and his field tests were unscientific and irrelevant.

The admissibility of expert testimony is governed by Fed. R. Evid. 702, which provides,

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is

---

[2] This is publication Number 6, discussed below.

> based upon sufficient facts or data, (2) the testimony is the
> product of reliable principles and methods, and (3) the witness
> has applied the principles and methods reliably to the facts of
> the case.

Under *Daubert v. Merrell Dow Pharmaceuticals Inc*., 509 U.S. 579, 597, 113 S.Ct. 2786 (1993), the trial judge serves as a "gatekeeper" to determine whether an expert's testimony is reliable and relevant. "The trial judge has considerable leeway in deciding how to go about determining whether particular expert testimony is reliable." *U.S. v. Sanders*, 59 Fed.Appx. 765, 767 (6th Cir. March 7, 2003)(citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167)).

The Sixth Circuit has noted,

> *Daubert* set forth a non-exclusive checklist for trial courts to use in assessing the
> reliability of scientific expert testimony. Fed.R.Evid. 702 (advisory notes). The
> specific factors explicated by the *Daubert* court are (1) whether the expert's technique
> or theory can be or has been tested; (2) whether the technique or theory has been
> subject to peer review and publication; (3) the known or potential rate of error of the
> technique or theory when applied; (4) the existence and maintenance of standards and
> controls; and (5) whether the technique or theory has been generally accepted in the
> scientific community.

*Avery Dennison Corp. v. Four Pillars Enterprise Co.*,  45 Fed.Appx. 479, 483 (6th Cir. Sept. 3, 2002). The *Daubert* factors may be applied by the Court even if the evidence at issue is based on "technical or other specialized knowledge." *See, Kumho Tire Co. v.  Carmichael*, 526 U.S. 137 (1999).

Defendants assert Kaae does not have the requisite expertise with respect to ultrasonic pest repellent devices and, therefore, he is unqualified to provide expert testimony on the issue of whether the Bell+Howell devices are able to repel pests. While his resume shows that Kaae has a PhD in pest management-entomology and has worked as a professor of pest

6

management, he admitted at deposition that he had no prior experience with Bell+Howell Ultrasonic Pest Repellers or any other type of ultrasonic insect or rodent repellent devices. He never tested any such devices and when asked if any of the courses he taught involved the devices, he testified that "I am sure we talked about them."  He testified that he has never been involved in the design of any repellent, been hired to test an ultrasonic repellent device, or written about such a device. (Kaae depo. 11-21) In sum, he admitted to having no experience with any ultrasonic insect or rodent repellent prior to this case.

Plaintiff admits that Kaae has no experience with ultrasonic pest repellers, but argues that although he lacks specialization in that particular field, he is still qualified given the fact that he has studied insects and pest management for over 50 years.   Although, plaintiff does not show how Kaae's background in entomology qualifies him to opine about the capabilities of the Bell+Howell device of which he has no prior experience, the Court will assume based on his 50 years of studying insects and pest management that Kaae is qualified to offer his opinion.

Assuming Kaae is qualified to opine regarding the capabilities of the ultrasonic pest repeller, defendants argue that the bases for his opinions are not scientific.  As set forth above, he has two bases for his conclusion-  publications authored by others and his own field tests. For the following reasons, this Court agrees with defendants.

Kaae's report lists five publications identified as "Scientific Literature used in Opinion."  (Doc. 25 at 3)[3]  Defendants point out that Kaae testified at deposition that he only

---

[3]  Additionally, Kaae reviewed the Bell+Howell Ultrasonic Pest Repeller Efficacy Tests upon which defendants have relied (identified as Number 4).

7

read one of the publications- identified as Number 6.[4]  This is entitled *Sonic Deterrents in Animal Damage Control: A Review of Device Tests and Effectiveness.* (Doc. 25) This is the publication identified by Kaae in the conclusion to his report. (Kaae depo. 46-52) Kaae testified that he obtained the publication references from the Mallis textbook or handbook of pest control. He read about the results of the listed publications in the Mallis textbook. (*Id.* 48-50) The Mallis textbook was not listed in his report as a publication he relied on. (Doc. 25) He also testified that none of the publications dealt with the Bell+Howell device and he could not identify what device was actually studied:

> Q. Do you know the devices that were actually examined which are the subject of the five publications set forth on page 3 of your report?
>
> A.  One more time?
>
> Q. Sure.  Can you identify the devices that were actually studied and tested in the five publications that you set forth on page 3 of your report?
>
> A.  What do you mean by identify?
>
> Q. Do you know what the devices were that were the subject of those publications?
>
> A. They don't normally name them.
>
> Q. So, we don't know what devices are the subject of the five publications; correct?
>
> A. Right.

(Kaae depo. 44) None of the articles mentioned the Bell+Howell device.  (*Id.* 38) Kaae testified:

> Q. Okay. Well, do any of the articles mention the Bell and Howell device?

---

[4]  As discussed below, he also read the Kansas State University powerpoint presentation (identified as Number 5).

>A. No.
>
>Q. So, is it fair to say if we don't know whether those five articles even reference the Bell and Howell device, that those conclusions reached in those articles shouldn't be relevant in determining whether this Bell and Howell device in our case is defective or not?
>
>A. No, I don't agree with that.
>
>Q. Why?
>
>A. Because we don't know the parameters that were used in all the tests.
>
>Q. We don't know the parameters from the five publications that were used?
>
>A. And -- yeah, as far as, you know, frequencies and those type of things.
>
>Q. But we know that in those five articles whatever study or tests they did, it did not involve the Bell and Howell repellent device in this case, correct?
>
>A. We don't know.

(*Id.* 38)  As for publication Number 6 (*Sonic Deterrents in Animal Damage Control*) that he did read, Kaae described it as "an article analyzing all ultrasonic tests in general and giving opinions on those." He did not know what device was examined or tested by the authors of that publication.  Nor could he identify what specific insect or rodent was being tested. (*Id.* 51, 54)   Kaae further acknowledged that as to some of the publications, only certain insects (i.e., cockroaches) were being tested. Furthermore, he testified that some of the publications showed the repellent devices had "some effect on certain insects."  (*Id.* 36, 37)

Although not addressed by plaintiff, other than publication Number 6, Kaae read a report done by Kansas State University.  (Kaae depo. 97) This is listed as publication Number

9

5. It is a powerpoint presentation and is attached to the expert report.[5] The expert report contains a separate discussion on the Kansas State University report. Five ultrasonic commercial devices were tested and one deterred cockroaches. Otherwise, the devices generally had no effect on ants and spiders. (Doc 25 Ex. 3) Kaae testified that "Number 5 did a multiple testing, and some of them had some effects on certain insects." (Kaae depo. 36)

Plaintiff does not dispute that Kaae did not know which ultrasonic devices were tested in the various studies but argues that he could rely on them because "none of the studies concluded that any ultrasonic pest repeller could drive pests from a home." (Doc. 36 at 5) Plaintiff notes that even defendants' expert could not point to a study that concluded that ultrasound drives pests out of a home.[6] (*Id.*) Plaintiff does not dispute that Kaae did not read the publications, other than Number 6, but copied the citations from another textbook and summarized their findings. Plaintiff argues that Kaae properly relied on the *Handbook of Pest Control* authored by Arnold Mallis and which defendant's expert agrees is a recognized source for pest management in the field of entomology. Plaintiff refers to Kaae's testimony that the Mallis textbook, which was not listed in the report, summarizes multiple studies of ultrasonic pest repellers. Plaintiff notes that while a scientist "may not parrot or vouch for [another scientist's] analysis and opinions, he is permitted to state that [the scientist's] conclusions dovetail with and support his own." *In re Whirlpool,* 45 F.Supp.3d 724 (N.D.Ohio 2014) In that regard, plaintiff asserts that Kaae did his own experiments and

---

[5]  Defendants' discussion seems to confuse publications 5 and 6. (See, for example, Doc. 34 at 3)

[6]  But, Kaae did testify that some devices had effects on certain insects.

concluded that defendants' ultrasonic pest repellers did not repel ants.

Plaintiff's argument fails to directly address whether Kaae's methodology of relying on publications he did not read in reaching his opinion is accepted in the scientific community.  Moreover, Kaae concluded,  "Based on the provided and prevailing scientific literature it is clear that ultrasonic pest repellers are generally unable to repel cockroaches, ants, spiders and small vertebrates such as mice in any manner. See Sonic Deterrents in Animal Damage Control[7] in the case of mice and other rodents."  However, as discussed above, Kaae did not identify which insects or rodents were being examined in Number 6 (*Sonic Deterrents in Animal Damage Control*). Additionally, publication Number 5, the Kansas State University powerpoint, tested five ultrasonic commercial devices and one deterred cockroaches.  Otherwise, the devices generally had no effect on ants and spiders. Mice are not discussed.  Thus, Kaae's stated conclusion is not based upon sufficient data or the product of reliable principles.

Plaintiff maintains that Kaae may testify that the opinions of the other researchers support and dovetail with his own.  Indeed, the second basis of Kaae's conclusion is his own "research through a field test."  (Doc. 25).  As set forth above, he opined that the "Bell+Howell Ultrasonic Pest Repeller is not able to repel ants in any manner."  As explained in his report and discussed in his deposition, Kaae conducted three field experiments on the Argentine ant- the most common house-infesting ant in Southern California.  In so doing, he purchased a four-pack of the Bell+Howell Ultrasonic Pest Repeller. Kaae tested the effect of the device on three Argentine ant activities: 1) Random foraging for a food source- He filled

---

[7] This is publication Number 6.

four plates with water-sugar solution and placed them in different locations with the repellers placed two feet away from each and pointing directly toward each plate.  2) Following well-established trails- He found four separate well-formed trails outside and leading into the house.  The repellers were placed two feet from and pointed directly at each trail. 3) Long term feeding activity- He left a plate of liquid sugar in place with a repeller placed two feet from and pointing directly at the food source.  As to each of the three tests, he concluded that the repellers had no apparent effect and none of the ant activities was deterred. (Doc. 25)

Defendants argue that Kaae's field tests are unscientific and irrelevant for several reasons.

First, Kaae's field tests were conducted on Argentine ants only. Kaae acknowledged at deposition that he did not test any other species of ant or mice, rats, cockroaches, or spiders. (*Id.* 129-130)

Second, despite testifying at deposition that the only valid method of testing the effectiveness of the devices was to use two infested houses and place the device in one house to observe whether it works, Kaae failed to conduct his tests in this fashion. During deposition, Kaae testified:

> A... In order to do a test on that to find that out, you would have to take two separate houses, all right, introduce a bunch of cockroaches, or maybe have an infestation, keep that device on constantly and see if it drives them out after a given period of time, weeks. That is the only way you could test that to prove that it actually will repel or drive out the pest species out after a structure. Same thing with rats. Same things with mice.
>
> \*\*\*
>
> Q. Is it your opinion that the only way you could prove whether the Bell and Howell device is effective or not is to test the Bell and Howell device by using two houses, infesting them with the insects and rodents, and then having the Bell and Howell

device activated in one of the homes, and essentially examine the results over a certain number of days, is that fair?

A. That has never been done, but yes, that is something you could do.

Q. Is that the -- I thought you said that was the only way you could prove or disprove the effectiveness of the Bell and Howell device is to use two houses -- structures, and then infest them with the insects or the rodents that the device is supposed to repel with one of the homes having the activated Bell and Howell device and the other home not having it; is that the only way to prove or disprove the effectiveness of the device?

A. Well, you could do the same thing if you had two structures that were already heavily infested would be another alternative.

Q. It would be cheaper than having bring in the --

A. Sure.

Q. Okay. But is that the only way that you believe as an expert that you could be able to definitively prove or disprove the effectiveness of the Bell and Howell device?

A. You mean in a real life situation? That is exactly what I am talking about.

Q. Is that your --

A. Yes, yes.

\*\*\*

Q. So, is it your opinion that unless an ultrasonic repellent device is tested in the two house field test that we talked about earlier, that testing would not be valid to determine the effectiveness of the particular device being tested; is that fair?

A. In general or as what was done by Bell and Howell?

Q. No, no, in general.

A. In general, who knows what -- depends on the product.

Q. But if we are discussing an ultrasonic·pest repellent -- and not in particularly the Bell and Howell device, but in general ultrasonic pest repellents; is it your opinion that the only way that the effectiveness of those products can be proven or disproven is to do the two house field test scenario that you talked about?

13

A. Yes, absolutely.

(*Id.* 70, 71-73, 90-91).

Third, the field tests were conducted in a manner contrary to the product's instructions for the proper use of the Bell+Howell devices. In particular, Kaae conducted the tests outdoors although the instructions state the product is for indoor use only, he did not know if the weather conditions affected the devices although users are warned not to expose them to rain or moisture, and he provided a food source although the instructions state that food should be put away.  Kaae testified that he conducted his fieldhouse tests at his home in California and that all the sugar water plates were placed outside his home and the trails were outside as well. Kaae acknowledged at deposition that the Bell+Howell instructions stated that the devices were for "indoor use only." Kaae testified, "If they say that that's true, but they are not saying that it won't repel outdoors.  If it's going to work, it's going to work." (Kaae depo. 120, 123) The warnings on the devices state not to expose the devices to rain or moisture.  When asked at deposition whether he recorded the weather conditions or dew point over the three to four week test period, he responded that he did not and "Frankly, to me it doesn't change.  I'm at the beach."  He also added that most of the devices were protected by a roof or under a chair.  (*Id.* 124-125) Finally, the instructions state that all food should be put away because the smell of food attracts pests. (Doc. 33 at 5) Kaae testified that his test did not violate the instruction "because the food had to be there for the test to be done."  (*Id.* 126-127)

Fourth, Kaae failed to use a "control" to determine the ability of the devices to repel ants, i.e., he did not have sugar water plates without the devices. Kaae testified:

14

Q. I think in your report you mentioned that the average number of ants feeding in your plates of water and sugar was approximately 90 plus ants; correct?

A. Each time I tested it, yes.

\*\*\*

Q Let me ask you this. How many ants would have been in the plates of water and sugar if you had no -- if you didn't put any Bell and Howell devices out there, do you know?

A. Same number.

Q. How do you know?

A. Because based on what I -- well, I am not even saying that.  What I am saying is there was a huge number of ants going into the plates on average at any one time, 90, all right, and in order to get to those plates, they had to pass over that so-called barrier of the ultrasound to get there. That is what I am saying.

Q. I understand, so -- but we don't know -- and more importantly, because it's your deposition, you don't know how many ants would have gone on to the plates of water and sugar if there was no Bell and Howell device located there; is that fair?

A.Sure.

Q. So, really we don't know if this Bell and Howell device in your test repelled any ants or a lot of ants; is that fair?

A. Well, I would consider 90 ants going into a house to be an infestation. I mean, basically, there were tons of ants there, you know.

\*\*\*

Q. Would you agree with me that speculation should not be part of a scientific test?

A. Sure.

Q. Can you tell us how many ants were repelled, if any, in your outdoor test?

A. How many repelled?

Q. Yes.

      A. No.

*\*\*\**

      Q. Well, we really don't know if these Bell and Howell devices in your tests repelled any ants or even thousands of ants, isn't that correct?

      A. Could be.

      Q. Because we don't -- because we didn't have a plate of water and sugar left there without the devices, correct?

      A. Sure.

(*Id.* 134, 135-136, 138-139, 140)

Fifth, because Kaae developed the tests only for use in this case, his method of testing is not generally accepted, and his tests were not reviewed by other experts.

Plaintiff argues Kaae's methodology is reliable. Plaintiff points out that the Sixth Circuit has recognized that "the test of reliability is flexible and the *Daubert* factors do not constitute a definitive checklist or test." *Hutchinson v. Parent,* 2015 WL 1914794 (N.D.Ohio April 27, 2015) (citations omitted) Plaintiff also points to a Third Circuit case which states:

> The evidentiary requirement of reliability is lower than the merits standard of correctness. *Daubert* states that a judge should find an expert opinion reliable under Rule 702 if it is based on 'good grounds,' i.e., if it is based on the methods and procedures of science... the focus must be solely on principles and methodology, not on the conclusions that they generate. The grounds for the expert's opinion merely have to be good, they do not have to be perfect...
>
> ... [T]he reliability requirement must not be used as a tool by which the court excludes all questionably reliable evidence. The ultimate touchstone is helpfulness to the trier of fact, and with regard to reliability, helpfulness turns on whether the expert's technique or principle is sufficiently reliable so that it will aid the jury in reaching accurate results.

*In re Paoli Railroad Yard Pcb Litigation,* 35 F.3d 717 (3rd Cir. 1994) (internal quotation marks and citations omitted). Plaintiff maintains that Kaae's methodology will be helpful to

16

the finder of fact.  The jurors could conclude from his report that ants will not be deterred or diverted by the defendants' product, much less driven out of the house. Plaintiff asserts that the jury can consider defendants' arguments about Kaae's tests in conjunction with Kaae's testimony. Plaintiff notes that Kaae did not indicate that the devices were exposed to rain or water and that there is no evidence that a house with a food source for pests is abnormal. Nor is there evidence that it would be unreasonable to expect a pest management product to control pests in a situation in which the pests were attracted by a food source. As to the lack of a control, plaintiff points to Kaae's deposition testimony that over the 16-day period, a quarter million ants got through the barrier which shows that the device is not effective. Additionally, Kaae observed the trail of ants and saw no ants deterred by the devices. (Kaae depo. 137, 145)

      Plaintiff does not address the fact that Kaae only tested Argentine ants. On this basis, he would be unable to opine as to whether the devices deter other insects or vertebrates. Nor does plaintiff address the fact that Kaae tested the devices outdoors.  Considering that the devices purportedly use "ultrasonic sound waves," this would presumably be the most important factor especially given that the devices are for indoor use only. Additionally, the lack of a control means there is no basis to compare the number of ants present with the devices versus without them.  On this basis, the Court agrees with defendants that Kaae's tests are flawed and, therefore, unreliable. Further, his testimony would probably mislead rather than assist the trier of fact. If the jury is told he is an expert, the lack of a reliable methodology would likely confuse them.

      For these reasons, the Motion to Exclude the Testimony of Plaintiff's Proffered Expert

Witness Richard Kaae is granted.

Defendants move for summary judgment on two basis: 1) Both the fraud and breach of express warranty claims fail because plaintiff's expert's testimony should be excluded and 2) the breach of express warranty claim fails for lack of failure to provide pre-suit notice. Because the expert testimony has been excluded, summary judgment is granted.

Furthermore, although defendants moved for summary judgment on the basis of the lack of expert testimony supporting the claims, plaintiff attempts to shift the burden of proof to defendants.  In its response, plaintiff argues that defendants have no evidence that the devices are capable of repelling pests as represented. In particular, plaintiff points out that in 2001, the FTC sent warning letters to more than 60 manufacturers and retailers of ultrasonic pest control devices stating that the efficacy claims about the repellers must be supported by scientific evidence.  As evidenced by emails, defendants were warned by their business advisor that the FTC had previously investigated claims made to manufacturers of ultrasonic pest repellers regarding the efficacy of the devices. The email advised defendants that they should be concerned about efficacy claims. Defendants' expert, Jeffrey Brown, could point to no evidence that the devices work. Additionally, defendants withheld evidence from Brown of other relevant testing.  In sum, plaintiff states:

> Fifteen years after the FTC began investigating manufacturers of these devices, and despite having sold tens of thousands of the devices to unwitting consumers, Defendants have no evidence their products work as they represented to consumers across the country. The only testing Defendants conducted after the FTC warnings did not actually demonstrate that the devices could "drive pests out" of a home as represented to consumers. Troublingly, Defendants concealed various tests and thousands of other documents, withholding them and not producing them initially in discovery.

(Doc. 38 at 2). And,

> Today Defendants continue to sell their "ultrasonic pest repellers" with no evidence they work for the reason consumers purchased them. And the last minute effort to find someone who would say the devices would work fell flat. Indeed, Defendants could not find a single fact or conclusion from him to use in their summary judgment motion to support their position.

(*Id.* at 5)

On summary judgment, "The moving party's burden may be discharged by demonstrating that there is an absence of evidence to support an essential element of the nonmoving party's case for which he has the burden of proof." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "Once the moving party demonstrates this lack of evidence, the burden passes to the nonmoving party to establish... the existence of a disputed factual element essential to his case with respect to which he bears the burden of proof." *Id.*  Thus, plaintiff herein, who bears the burden of proof on her claims, may not merely point out that defendants have no evidence that their devices work but she must point to evidence that the devices do not work. As discussed above, plaintiff does not have the evidence because Kaae's report must be excluded.

In fact, in her brief in opposition to the Motion for Summary Judgment, plaintiff devotes only three paragraphs to the issue of her expert.  Plaintiff states, "While the defendants insist that Dr.Kaae's testimony is inadmissible, his testimony is not rebutted by the defendants. In other words, defendants do not cite any evidence showing that Dr.Kaae's findings are incorrect, or in any way showing their ultrasonic pest repellers actually work." (Doc. 38 at 3) Plaintiff then merely re-states Kaae's qualifications in insect and pest management, and that he prepared his expert report based on his education, experience, the scientific literature, and his own tests. Plaintiff reiterates Kaae's opinion that the repellers do

not work. (*Id.* at 8) Plaintiff does not address defendants' arguments that Kaae's testing was limited to Argentine ants, that the testing was conducted in a manner contrary to the intended use of the devices, or that testing failed to include a control.

For the reasons discussed above, summary judgment is appropriate because plaintiff's expert testimony is inadmissible.  Plaintiff spends eight pages discussing whether the filing of a complaint can serve as notice of a breach of warranty claim. However, the Court need not reach this argument as summary judgment is appropriate on the breach of warranty claim for the reasons stated above.

**Conclusion**

For the foregoing reasons, defendants' Motion for Summary Judgment and defendants' Motion to Exclude the Testimony of Plaintiff's Proffered Expert Witness Richard Kaae are granted.

IT IS SO ORDERED.

 /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated: 11/29/16